UNITED STATES v. YOUNG.

(District Court, M. D. Alabama. February 18, 1904.)

1. NATIONAL BANKS—OFFENSES BY OFFICERS OR AGENTS—MAKING FALSE ENTRIES.

The entry on the books of a national bank by the cashier as a "cash item" of a check which actually entered into a transaction of the bank will not support an indictment of the cashier, under Rev. St. § 5209 [U. S. Comp. St. 1901, p. 3497], for making a "false entry," although it is further charged that he knew the check to be worthless and fraudulent,

and made the entry with intent to deceive, etc. The entry, being a truthful statement of the actual transaction, cannot be converted into a false entry by any other fraudulent or unlawful act of the cashier.

Criminal Prosecution under Rev. St. § 5209 [U. S. Comp. St. 1901, p. 3497]. On demurrers to indictment.

The indictment originally contained 46 counts. The government, being required to elect by the court, nol prossed all but 12 of the counts. These remaining 12 counts charge the making of false entries, under section 5209 of the Revised Statutes [U. S. Comp. St. 1901, p. 3497]. They refer to different items and entries, made on the books of the bank in different capacities, sometimes as teller and sometimes as cashier. They sometimes charge the entries were made with intent to defraud the association, etc., and sometimes to deceive any agent who might be appointed to examine the affairs of the bank, etc. The fifteenth count is like all the others, but makes the strongest statement as to the falsity of the entries. A synopsis of its allegations is necessary to a proper understanding of the ruling upon demurrer as to the other counts. That count, by formal prefatory averments, shows the organization of the bank; where it did business, etc.; defendant's connection with it as cashier, etc.; and then avers that the defendant, as such cashier, "did make in a certain book belonging to and in use by the association in transacting its banking business," said book being particularly described, covering a period which is given, "an entry in words and figures as follows, to wit: Cash items, four thousand seven hundred sixty-five and $82/100$ dollars." It further avers "that the entry [describing it] in the described book then and there purported to show, and did in substance and effect indicate and declare, that said Edward B. Young, as such cashier, did then and there, at the time said entry was so as aforesaid made, have in his possession, as such cashier, as the property of said association, real, valid, and proper cash items, amounting in the aggregate to four thousand seven hundred sixty-five and $82/100$ dollars." It then proceeds: The entry "was then and there false, in this: that said entry represented that said Edward B. Young, as such cashier of said association, then and there had in his possession as such cashier divers cash items, which, when taken and counted together, made the aggregate sum of four thousand seven hundred sixty-five and $82/100$ dollars; and which said entry then and there purported to show, and did in substance and effect indicate and declare, that he, the said Edward B. Young, then and there had in his possession, as such cashier, divers real, valid, and proper cash items, amounting in the aggregate to four thousand seven hundred sixty-five and $82/100$ dollars; and said entry so as aforesaid made was false, in this: that one of said cash items [which is set out], being a check drawn on the Eufaula National Bank, to the order of warrants for twenty-one hundred dollars, and signed by Edward B. Young as city treasurer, was then and there, at the time of said entry, in truth and in fact worthless, valueless, and fraudulent, as he, the said Edward B. Young, at the time said entry was so made, well knew."

The demurrers raise several objections: First, that the counts do not show that the Comptroller of the Currency had appointed, or would appoint, an agent to examine the affairs of the bank; second, that the items alleged to be worthless, fraudulent, and valueless might be so, and yet be real, valid, and proper cash items; third, that the counts do not allege wherein the items said to be worthless, valueless, and fraudulent were worthless, etc.; and, fourth, that the counts do not charge or allege that the entries alleged to be false did not truly represent a transaction that actually occurred in the business of the bank.

W. S. Reese, U. S. Atty.

S. H. Dent, Sr., Lee H. Weil, and Phares Coleman, for defendant.

JONES, District Judge (after stating the facts as above). The gravamen of all the counts, stripped of legal phraseology, is that the cashier or teller, as the case may be, made false entries on the books of the aggregate of his "cash items," by including therein a particular

item, based upon paper which was "worthless, valueless and fraudulent," and known to be so at the time of the entry, etc., with intent to deceive, etc. Does such an entry constitute a false entry, within the meaning of section 5209 of the Revised Statutes? If the entry was not false within the meaning of the section, it is hardly necessary to say that the making of it, with intent to deceive or defraud, etc., would not constitute an offense under the section. The intent with which the entry was made is wholly inconsequential, in that view.

In the first part of section 5209 [U. S. Comp. St. 1901, p. 3497] Congress made embezzlement, abstraction, and willful misapplication of the money, funds, and credit of any national banking association, and other specific acts, by which the funds or credit of a national banking association could be unlawfully imperiled, criminal offenses against the United States; and then, at the end of the section, created the offense of making "any false entry" with intent to deceive, etc. At the same time, and in the act of which this section forms a part, Congress enacted very comprehensive regulations for the business of national banking associations. This act, carried forward in appropriate sections of the Revised Statutes, invests the Comptroller of the Currency with large visitorial power over them, empowers him, among other things, to appoint examiners to ascertain and report upon their condition, to appoint receivers of such associations, in certain contingencies, and also to call upon them for special reports, according to forms prescribed by the Comptroller, showing their condition, etc., and requires these reports to be published in the place where the bank does business—all this that the public, as well as the government, may be informed of the condition of the bank, and act accordingly in their dealings with it. Having thus enacted safeguards for the preservation of the funds and credit of the association, and declared criminal penalties for transgression of regulations in those respects, Congress did not have to go over, and cannot be held by any legitimate construction to have intended to go over, the same ground, when it created the offense of making "any false entry." The several misdemeanors which the section creates apply to separate and distinct offenses. Clearly, that part of the section which creates the offense of making "any false entry" was not designed to cover other criminal breaches of duty, for which the law had already provided in prior parts of the section; but had other objects in view.

One important purpose of this provision as to "any false entry" was undoubtedly to stimulate integrity on the part of the officials in the conduct of their business. This the provision secures, as far as law can effect such a result, by forbidding bank officers, under penalties, to misstate by "any false entry" what they do. Another dominant purpose was, by enforcing true entries, to spread upon the books of the bank accurate statements of things done by the bank officers, to the end that bank examiners might be the better enabled thereby to trace and determine accurately, day by day, the actual condition and conduct of the business of the bank. The duty with which we are here concerned is the duty not to enter a false statement of the aggregate amount of "cash items." The cashier's books are not intended to furnish, and are not kept to show, the history or the origin of paper

taken by the cashier, whether received in good or bad faith, or "worthless and fraudulent." Other parts of the section had provided penalties for breaches of duty in this respect by persons handling the bank's cash. The sole purpose of this provision is fully accomplished if the item included in the "cash items" is truthfully based on any actual transaction with the cashier, which increases or diminishes the cash in his hands. The demand of this provision is that when a check, though "worthless and fraudulent," whether knowingly received or not, is received by the cashier, that the amount paid out on account of it, the particular—the detail—on which the item in his cash account is based, shall be truly stated. Obedience to that command, truly making the entry, though the history of the check and the cashier's dealing with it may bring him under condemnation of other provisions, cannot make him a transgressor against this provision.

If we stop a moment to consider what the "item" is which must enter into the cash statement, it will be seen at once that the good or bad faith in which the paper is taken, or its value or worthlessness, cannot determine whether the entry of the "item" as to it, or its inclusion under the aggregate of "cash items," is true or false, in the sense of this provision of the statute. One of the meanings of item is, "an article; single entry; anything which can form part of a detail; the particulars of an account." The detail, or particular here—the "item"—is on what account the sum stated has been paid out. This check is the thing which forms part of the detail—the "item"—which shows what was done with the bank's money as to it. The inclusion in the cash of a perfectly good check drawn on the bank, if that check has not in fact entered into any transaction of the cashier upon which he parted with money of the bank, would constitute a "false entry," if included in the "cash items" with intent to deceive. On the other hand, knowingly entering or including in the "cash items" an item based on a "valueless and fraudulent" check, if it were in fact received in a transaction with the cashier at the time the entry is made, and he paid out the amount of money included in the "item" on account of it, and truly entered or included the item in his "cash item," could not constitute a false entry. It is immaterial here, therefore, whether or not the check was in fact "worthless and fraudulent."

The cashier, by including the item here in his "cash items," did not declare or represent that the check upon which the item was based was good or supported by honest consideration. The entry makes no representation whatever as to that. The legal effect of the entry is but a written representation to whom it may concern that the cashier, in an actual transaction, had received the check, and that the amount stated was the basis of one item, which went with others to make up the aggregate "cash items" which the entry declared the cashier had at the time. The several counts assail the truth of the entry solely on the ground that the amount of one of the items which entered into the aggregate "cash items" was based on a check or paper which was fraudulent and worthless, and known to be so at the time of the entry. The cashier in that event would be equally bound, as in the case of a good check bona fide received, in stating his transactions upon the books, to make a proper "cash item" as to such check, irrespective

of its being taken in good faith, or knowingly received in bad faith. The several counts do not deny that the truth had been stated in the entry, or that the check upon which the item was based had been received by the cashier in an actual transaction with the bank. The several counts, therefore, resolve themselves into an assertion that the recital truthfully made by the cashier of the fact that he has included in his "cash items" an item based on a check received by him in an actual transaction with the bank, is converted into a false entry because he knew at the time the entry was made that the check was "worthless and fraudulent," etc. The fraud which entered into the consideration or taking of the check by the bank cannot obliterate or recall the fact that such a check was actually taken by the bank in a transaction with the cashier, who truly recited the fact upon the books. It cannot be a false entry to enter upon the books of the bank a correct recital as to the taking of the check and its inclusion as an item in the aggregate "cash items" of the bank. The truth of what the cashier actually did with the bank's cash as to this check, and statement he made about the cash in the entry on the books of the bank, is not altered in any way by the fact that he knew the check was "worthless and fraudulent." The entry, as we have seen, involved no assertion as to the value or bona fides of the check. It stated the exact truth of the transaction as it is entered on the cash account. It cannot be a false entry to make a recital on the books of the bank which speaks the truth. Coffin v. U. S., 156 U. S. 446, 15 Sup. Ct. 394, 39 L. Ed. 481; Id., 162 U. S. 682, 16 Sup. Ct. 943, 40 L. Ed. 1109; Graves v. U. S., 165 U. S. 324, 17 Sup. Ct. 393, 41 L. Ed. 732. The averments here are quite different from those in the indictment in United States v. Britton, 107 U. S. 657, 2 Sup. Ct. 512, 27 L. Ed. 520. There it was specifically alleged that the item entered, representing cash, etc., "was not then and there received by said association upon any account, from any source," as he well knew.

What constitutes the basis of "proper cash items" on the books of the cashier or teller is not defined by law. It depends on the particular bank's mode of paying out its cash and keeping the account with its cashier. The indictment is silent as to the custom of the Eufaula National Bank in this respect. Many large banks do not treat checks drawn on it and paid by the cashier as any part of the "proper cash items" of the cashier, as the checks are delivered by the cashier or teller to some other officer, who credits him and charges them to other accounts. Such banks include in the "proper cash items" of the cashier only money or papers due from other persons or banks, which are immediately available to bring in cash, and remain uncollected in the hands of the cashier or teller. In the absence of any custom of banking of which the court can take judicial notice, or statements in the indictment showing that the words "cash items" were used in the technical instead of their ordinary sense, the words of the indictment do not by any means exclude, as the basis of "proper cash items," a paid check drawn on the bank by a depositor in funds, if the cashier has parted with the bank's money for it. "Proper cash items" in a cashier's accounts ordinarily include not only money on hand, but everything for which he has paid out the association's cash during a

particular day or business period. They are vouchers, particulars, "cash items," which show what he has done with the money. Generally, in large banks, drafts, bills, notes, or other evidence of value, purchased or discounted by the bank, for which the teller or cashier pays out the association's cash, are not turned over to him. A cash slip or memorandum is made by some other officer or agent of the bank, which is the cashier's voucher or authority to pay out the amount of money named in it. In such case this memorandum slip or order, and not the paper which it represents, constitutes the "proper cash item" in the cashier's accounts which should be entered on the books. If, however, the teller or cashier himself, out of the money in his hands on any particular day, loans money on a paper, or buys it, such paper would constitute a "proper cash item," entering into the day's business of the cashier, and would so continue until by passing to some other officer or department, and giving credit for it to the cashier in his cash account, it ceases to be a "proper cash item" on the cashier's or teller's books.

To prevent confusion, it is proper to add that the "proper cash items" above referred to must not be confounded with "checks and other cash items" which the association is required to state under the head of "Resources" in the forms prescribed by the Comptroller of the Currency for reports of the "condition" of the bank. The purpose of these reports is to enable him to ascertain whether the bank is solvent by comparing its "resources" with its "liabilities." A check drawn on the cashier's bank by a depositor who has funds to meet it, and paid by the cashier out of its cash, is far from being an asset or resource. It is only evidence of a debt paid. For that very reason, however, as it diminishes the cash, such a check would be a proper item of the cashier's accounts with the bank, while it would be misleading and out of place in a statement of "resources" in a report made to the Comptroller. The intentional inclusion in such a report, under the head of "checks and other cash items," of a check drawn against deposits in a bank and paid by it, or of one drawn on another bank and cashed by the cashier, who knew the check was "worthless and fraudulent," without accompanying it by a true statement as to its value, would subject the officer signing the report to indictment, under another provision of the statute, for making a false report. That, however, is quite a different offense from making a false entry on the books of the bank, which is here charged.

It is unnecessary to discuss other objections raised to the indictment, since that already discussed is fatal to it. The demurrers are sustained.